UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

AREBE TAYLOR,

        Plaintiff,

    v.

BOARD OF REGENTS OF THE
UNIVERSITY SYSTEM OF
GEORGIA d/b/a UNIVERSITY OF
GEORGIA, et al.,

        Defendants.

CIVIL ACTION NO.

1:20-CV-5048-SEG

## OPINION AND ORDER

This case is before the Court on Defendants' Motion to Dismiss (Doc. 48). Plaintiff has filed a Response (Doc. 55) and Defendants a Reply (Doc. 58). Defendants move to dismiss Plaintiff's Second Amended Complaint (Doc. 43) under Rule 12(b)(6), as well as for failure to comply with a prior order of this Court (Doc. 39).[1] Defendants also assert the defense of qualified immunity on behalf of all individual-capacity defendants and contest the availability of injunctive relief.

In summary, the Court finds as follows. Plaintiff has failed to allege facts sufficient to state a substantive due process claim against any defendant

---

[1] This case was reassigned to the undersigned on April 18, 2022.

(Part III(A)).  Plaintiff has alleged facts sufficient to state a procedural due process claim with respect to his disciplinary process, but not his academic dismissal or any other aspect of the complaint.  (Part III(B)).  However, although he has stated this procedural due process claim, the relevant defendants are entitled to qualified immunity, and thus the procedural due process claim is due to be dismissed (Part V(A)).  With respect to his race discrimination claims, Plaintiff has failed to state a Title VI claim against the Board of Regents (Part IV(B)), but he has adequately stated a § 1981 claim against Defendants Harmon and Feldman (Part IV(C)).  At least at this stage, Harmon and Feldman are not entitled to qualified immunity with respect to the § 1981 claim (Part V(B)).  Plaintiff has not alleged sufficient facts to show entitlement to any injunctive relief under *Ex Parte Young* against any defendant in their official capacity (Part VI).  Plaintiff's claim for punitive damages must also be dismissed, as punitive damages are a form of relief, not a cause of action (Part VII).  Finally, the Court will not dismiss the Second Amended Complaint for failure to comply with its previous order (Part VII).

The Court, in other words, will grant Defendants' Motion to Dismiss (Doc. 48) as to all claims except Count VI of the Second Amended Complaint. The overall effect of this Order is that the case will go forward *only* with respect

to Plaintiff's race discrimination claims for money damages against Defendants Harmon and Feldman in their individual capacities.

## I.   Background

Plaintiff, a former graduate student in the Department of Public Health at the University of Georgia, brings constitutional due process claims under 28 U.S.C. § 1983, as well as race and national origin discrimination claims under 28 U.S.C. § 1981 and 28 U.S.C. § 2000d, also known as Title VI of the Civil Rights Act of 1964.  The claims are directed at the Board of Regents of the University of Georgia, various university administrators, and two members of the Public Health faculty who charged him with academic dishonesty and dismissed him from his graduate program.  The Second Amended Complaint ("the Complaint") is long and frequently repetitive.  These characteristics of the pleading have been the subject of some dispute in this case, including a Motion to Dismiss and/or Motion for a More Definite Statement (Doc. 26) and an order by this Court requiring Plaintiff to amend the pleadings to comply with Rule 8 of the Federal Rules of Civil Procedure (Doc. 39).

The well-pleaded allegations of fact in the Second Amended Complaint can be summarized as follows.[2]  Plaintiff is Black, a citizen of Sierra Leone,

---

[2] On a motion to dismiss, the court must take the facts alleged in the complaint as true.  *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1321-22 (11th Cir. 2012).

and a naturalized citizen of the United States.  He was admitted to the DrPH program at the University of Georgia in 2015.[3]  With certain exceptions discussed below, he was generally academically successful during his years in the program.  According to the graduate school's guidelines, he should have been appointed an advisory committee of three faculty members by the end of his first year, but he never was, despite asking repeatedly.  Plaintiff states that the promise of an advisory committee was a significant part of what drew him to the program.

A requirement for students in the DrPH program is the passage of a comprehensive exam.  Plaintiff first attempted the comprehensive exam in 2018 and failed.  Plaintiff alleges that his 2018 comprehensive exam "was not graded according to the stipulated grading rubric" and was evaluated not by his advisory committee—he had none—but by Defendant Harmon, a member of the public health faculty and the "DrPH Program Director/Coordinator." (Doc. 43 at 20, ¶ 56.)  The comments on this exam referred to, among other things, grammatical and spelling mistakes.  (English is not Plaintiff's first language.)  Plaintiff was not assigned to any formal remediation program,

---

[3] A DrPH is an advanced degree in public health.

either regarding the substance of the exam or his English composition, as he alleges he should have been.

In mid-March 2019, Plaintiff attempted the comprehensive exam for the second time. This time he "enlisted the help of a proofreader." (Doc. 43 at 22, ¶ 63.) The exam comprised a written and oral portion, and the written portion comprised two separate components that were uploaded separately.

On April 3, 2019, Plaintiff was notified that the second half of the written portion of his comprehensive exam had been flagged for possible plagiarism, a violation of the University's Academic Honesty Policy. Two weeks later, under the aegis of the University's Office of Academic Honesty, he had the first official meeting regarding the plagiarism accusations, called a "Facilitated Discussion." The meeting included Defendant Harmon, Plaintiff, and a mediator. Plaintiff alleges that he introduced evidence showing that the plagiarism, which involved one paragraph of his answer, was the result of his accidentally submitting the wrong document. He alleges that Defendant Harmon "refused to look at Plaintiff's evidence" and "disclosed that [Defendant] Dr. Stuart Feldman, Interim Head and Graduate Coordinator of UGA's Department of Health Policy and Management (HPAM), had already made a predetermined dismissal decision." (Doc. 43 at 27, ¶¶ 79-80.) No

agreement was reached at this meeting regarding any violations or consequences.

Then followed the "Continued Discussion," which despite its name is more of a hearing-like affair held before an "Academic Honesty Panel." Plaintiff received notice about a week in advance of this hearing that it would concern the comprehensive exam and his alleged plagiarism.  Here, Plaintiff presented his case, and Defendant Harmon, now accompanied by Defendant Feldman, presented the instructors' side.   Both Defendant Harmon and Defendant Feldman spoke against Plaintiff during the hearing, which Plaintiff claims was a violation of the Academic Honesty Policy rules governing its procedures.   Plaintiff alleges that Defendant Feldman was also "allowed to freely make interjections . . . in attempts to falsify Plaintiff's statements" during the hearing.  (Doc. 43 at 33, ¶ 104.)  During the hearing, Defendant Feldman also allegedly raised the separate issue of Plaintiff's use of a proofreader on the examination, alleging that this constituted "unauthorized assistance," a separate violation of the Academic Honesty Policy.  Plaintiff had not received any notice of this charge prior to the hearing.  (*See* Doc. 43-2 at 3.) Plaintiff did not contest the charges of plagiarism, but he tried to show the Panel that the charges implicated only one paragraph of his exam and that he had intended to submit a different document which was created

contemporaneously with the document containing the plagiarized material. Defendant Feldman advocated before the Panel for Plaintiff's dismissal based on the need to "preserve the integrity of the CPH program."  (Doc. 43 at 52, ¶ 180.)

The Panel found Plaintiff to have committed both plagiarism and unauthorized assistance violations, but it assigned only the consequence of "a '0' or the lowest possible grade on the academic work."  (Doc. 43-7 at 2.)  The absence of additional consequences is noteworthy, since under the Academic Honestly Policy, the Panel was required to impose some additional penalty absent "extraordinary circumstances."  If it found such circumstances to exist, it was supposed to explain them in writing.  (Doc. 43-6 at 13-14.)  The Panel offered no such explanation, but Plaintiff states "on information and belief" that the Panel accepted his arguments about the plagiarism being the unintentional result of a submission error.  (Doc. 43 at 38, ¶ 126.)

On the Monday following the Friday Continued Discussion, Plaintiff received a letter from Defendant Harmon stating that he would be dismissed from the program because of the Panel's findings.  (Doc. 43-8.)  The Panel's penalty—Plaintiff's failure of the comprehensive exam—meant that he had failed the comprehensive exam course for the second time, and according to the department's handbook, twice failing the comprehensive exam course

mandates dismissal from the program.   (Doc. 43 at 40, ¶ 131.)   Plaintiff disputes the way the grade was calculated, alleging, in essence, that Harmon and Feldman improperly "extrapolate[d]" the "zero grade" penalty to the entire exam, and thence to the entire course.   The pleadings suggest that Plaintiff believes the "zero grade" should have only applied to the portion of the written component of his exam that contained the plagiarized material.   The final grade for the comprehensive examination course was never entered into his transcript.

Plaintiff then began a series of appeals.   First he appealed the Academic Honesty Panel's decision to the University's Office of the President, which affirmed the Panel's findings.   Then he appealed the College of Public Health's dismissal decision several times, and the dismissal was affirmed at each level, including by the Office of the President (in November 2019) and subsequently by the Board of Regents (in February 2020), which granted discretionary review to his appeal.

In December 2020, Plaintiff initiated this lawsuit.

## II.    Jurisdiction and Standard of Review

The Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331.

Rule 12(b)(6) allows for dismissal of a case when the complaint "fail[s] to state a claim upon which relief may be granted." Fed. R. Civ. P. 12(b)(6). When evaluating a Rule 12(b)(6) motion, the court must take the facts alleged in the complaint as true and construe them in the light most favorable to the plaintiff. *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1321-22 (11th Cir. 2012). To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully," and when the "complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement of relief." *Id.* (citing *Twombly*, 550 U.S. at 557). The complaint thus must contain more than mere "labels and conclusions, and a formulaic recitation of a cause of action's elements"—it must allege facts that "raise the right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

In general, courts ruling on Rule 12(b)(6) motions to dismiss are confined to the pleadings; if they wish to consider extrinsic evidentiary material, Rule 12(d) compels them to convert the motion into a Rule 56 motion for summary judgment and to provide the parties with a "reasonable opportunity" to present additional relevant material.  *See* Fed. R. Civ. P. 12(d).  Courts may, however, consider certain "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice" in connection with a Rule 12(b)(6) motion.  *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007).  The Court does so here with respect to the exhibits attached to Plaintiff's Second Amended Complaint.  These include documents Plaintiff allegedly received in connection with his hearing and dismissal, the University's Academic Honestly Policy, and Plaintiff's doctoral transcript.

### III.   Due Process Claims

### A. Substantive Due Process

Counts II and IV of Plaintiff's Second Amended Complaint allege violations of Plaintiff's substantive due process rights under the Fourteenth Amendment to the U.S. Constitution.[4]  Defendants argue that he has failed to

---

[4] The Fourteenth Amendment provides, in relevant part: "No State shall . . . deprive any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV.

state a substantive due process claim because substantive due process protects only "fundamental" rights, and both the U.S. and Georgia Supreme Courts "have clearly ruled that there is no fundamental right to education." (Doc. 48-1 at 17) (citing *Plyler v. Doe*, 457 U.S. 202, 221 (1982); *San Antonio Indep. School Dist. v. Rodriguez*, 411 U.S. 1, 35 (1973); *D.B. Clarke County Bd. Of Educ.,* 469 S.E.2d, 438, 439 n.2 (Ga. Ct. App. 1996)). Plaintiff responds that, even if no such fundamental right has been recognized, some case law in this circuit suggests that "suspensions from state institutions may give rise to substantive due process violations if the actions of the state institution are 'clearly arbitrary and capricious.'" (Doc. 55 at 7) (citing *Childers v. Fla. Gulf Coast. U. Bd. of Trustees*, 2:15-CV-722-FTM-MRM, 2018 WL 623648, at *4-5 (M.D. Fla. Jan. 30, 2018)). In turn, Defendants reply that Plaintiff has not cited any cases "actually holding that a student has a substantive due process right in any educational setting," and that furthermore there is no such case binding on this Court. (Doc. 58 at 3.)

Defendants have the better of this argument. While it is true, as Plaintiff argues, that some Supreme Court and Eleventh Circuit cases have entertained substantive due process claims in the higher education context, these cases have always assumed, and never held, that such a fundamental right exists. *See Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 222-23 (assuming, on the

invitation of the defendants, that plaintiff had a protectible property interest in his position in a graduate program); *Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 91-92 (making the same assumption); *Nash v. Auburn Univ.*, 812 F.2d 655 (11th Cir. 1987) (assuming a protectible property or liberty interest exists in higher education context "without expressing an opinion on the point"); *Haberle v. Univ. of Alabama in Birmingham*, 803 F.2d 1536, 1539 n.1 (11th Cir. 1986) (assuming without deciding that Plaintiff had a protectible property interest in continued higher education).

Where the existence of substantive due process rights has not been assumed, the Eleventh Circuit has evinced an unwillingness to recognize them in this and similar contexts.  This can be seen from the case on which Plaintiff himself relies.  (Doc. 55 at 6-7) (citing *Childers v. Fla. Gulf Coast U. Bd. of Trustees*, 2:15-CV-722-FTM-MRM, 2018 WL 623648, at *4-*5 (M.D. Fla. Jan. 30, 2018).  The order of the magistrate judge in *Childers* cites, in turn, to *Koeppel v. Romano*, 252 F. Supp. 3d 1310, 1321 (M.D. Fla. 2017), *aff'd sub nom. Doe v. Valencia Coll.*, 903 F.3d 1220 (11th Cir. 2018).  *Childers*, 2018 WL 623648, at *4-*5.  While the district court opinion in *Koeppel v. Romano* does indeed say what Plaintiff wants—that is, that substantive due process claims might be brought in the educational context where institutional acts are "clearly arbitrary and capricious," *see id.* at 1321—the Eleventh Circuit

appeared to reject this reasoning even as it affirmed the result.  Contrary to the district court, the Eleventh Circuit simply denied the idea that "students at a public university . . . have a fundamental right to continued enrollment." *Doe v. Valencia Coll.*, 903 F.3d 1220, 1235 (11th Cir. 2018) (citing *Plyler v. Doe*, 457 U.S. 202, 221 (1982); *C.B. ex rel. Breeding v. Driscoll*, 82 F.3d 383, 387 (11th Cir. 1996); *McKinney*, 20 F.3d 1550, 1556 (11th Cir. 1994)).  This was the complete basis for its affirmance on the substantive due process question.  It conducted no review of whether the evidence did or did not support the proposition that the disciplinary decision in question was arbitrary, and it distinguished *Ewing* and *Horowitz* on the basis that those cases merely "assumed, without deciding, that federal courts can review an academic decision of a public educational institution under a substantive due process standard."  *See id.* at 1235-36, 1235 n.12 (quoting *Ewing*, 474 U.S. at 222-23).

*Doe v. Valencia Coll.* follows earlier Eleventh Circuit cases that expressly overruled precedents recognizing substantive due process claims in cases involving "state-created property right[s]," at least "in non-legislative cases" where the rights at issue are not "so fundamental that our democratic society and its inherent freedoms would be lost if that right were to be violated."  *See McKinney v. Pate*, 20 F.3d 1550, 1557 n.9, 1560-61 (11th Cir. 1994) (en banc) (quoting *Harrah Indep. School Dist. v. Martin*, 440 U.S. 194, 198 (1979)).  In

other words, where the challenged action is not an action of the legislature and the right at issue does not directly implicate our "inherent freedoms," only procedural due process claims are available. *See id.* at 1560. *McKinney* involved the termination of a public employee, but *C.B. ex rel. Breeding v. Driscoll* subsequently extended the *McKinney* holding to the educational context. 82 F.3d 383, 387 (1996); *accord Wells v. Columbus Tech. Coll.*, 510 F. App'x 893, 896 (11th Cir. 2013).

"In the absence of a fundamental right, executive action constitutes an actionable violation of substantive due process only if it shocks the conscience." *Lambert v. Bd. of Trustees*, 793 F. App'x 938, 943 (11th Cir. 2019) (citing *Tinker v. Beasley*, 429 F.3d 1324, 1327 (11th Cir. 2005)). The Court cannot say that Plaintiff's dismissal from his graduate program rises to the level of the conscience-shocking.[5]   Taken together, these cases foreclose Plaintiff's

---

[5] Even if the Court applied the standard urged by Plaintiff, he would not have stated a substantive due process claim. Under this standard, the Court would have to find that the facts gave rise to the reasonable inference that the decision to dismiss Plaintiff from his graduate program was "clearly arbitrary and capricious." *Koeppel*, 252 F. Supp. 3d at 1321. It could not do so, given that Plaintiff does not dispute the substance of the charges against him (although he does plead extenuating circumstances). For example, Plaintiff does not dispute that part of the exam answer he handed in was plagiarized; nor does he dispute that he received unauthorized assistance from a proofreader. (Doc. 43 at 108.) These facts provide enough of a basis for the imposition of a "zero grade" on the comprehensive exam that, along with the undisputed departmental policy of dismissing graduate students who twice fail

substantive due process claims as a matter of law, and the Court will dismiss them.

## B. Procedural Due Process

### i.     Academic and Disciplinary Dismissals

There are two types of due process cases arising in the academic context that are potentially relevant to this one.   The first set of cases concerns *academic dismissals* and the process due to students who are penalized not for breaking rules, but for underperforming academically.   *See, e.g., Bd. of Curators, Univ. of Mo. v. Horowitz*, 435 U.S. 78 (1978); *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214 (1985); *Haberle v. Univ. of Ala. in Birmingham*, 803 F.2d 1536 (11th Cir. 1986).   The second set of cases concerns *disciplinary proceedings* in the school or university context.   These cases deal with the process due to students who are charged with violating school rules and face

---

their comprehensive exams, the Court cannot call the dismissal "clearly arbitrary and capricious."   *Cf. Nash v. Auburn Univ.*, 812 F.2d 655, 667-68 (11th Cir. 1987) (in an academic dishonesty case, finding decision of university tribunal not to have been arbitrary where there was "substantial evidence" to support its conclusion); *Duke v. N. Tex. State Univ.*, 469 F.2d 829, 834 (5th Cir. 1972) (holding that, with respect to substantive due process claims in the academic context, a "court should . . . look to the record as developed before the academic agency to determine whether there was substantial evidence before the agency to support the action taken, with due care taken to judge the constitutionality of the school's action on the basis of the facts that were before the agency, and on the logic applied by it.").

serious consequences if found guilty.  *See, e.g., Goss v. Lopez*, 419 U.S. 565 (1975); *Doe v. Valencia Coll.*, 903 F.3d 1220 (11th Cir. 2018); *Barnes v. Zaccari*, 669 F.3d 1295 (11th Cir. 2012); *Nash v. Auburn Univ.*, 812 F.2d 655 (11th Cir. 1987).  The due process standards these cases establish are, understandably, very different.  While the requirements of the Due Process Clause are always contextually sensitive, it can be fairly said that they are generally more stringent in disciplinary proceedings—where at least notice and the opportunity to be heard are required, *see Goss*, 419 U.S. at 578-79—than in academic dismissals, where no formal hearings are required and instead the decision must only be "careful and deliberate."  *See Horowitz*, 435 U.S. at 85-87; *accord Haberle*, 803 F.2d at 1539.  In a case like this one, much will turn on whether the proceedings and penalty at issue are characterized as disciplinary, academic, or as some combination of both.

The Court will therefore begin by addressing this question.  The parties' disagreement about it threads through a large part of the briefing on the present motion to dismiss.  Defendants argue that "there are really two different types of decisions, and thus two different types of processes, involved here: (1) the disciplinary process related to the Academic Honesty Policy, and (2) the academic dismissal process related to Plaintiff's dismissal for failing the comprehensive exam."  (Doc. 48-1 at 18-19.)  Based on this reading of the

alleged facts, Defendants argue that Plaintiff got all the process he was due, since only the "careful and deliberate" standard for academic dismissals applies to Plaintiff's actual dismissal decision, while his punishment by the Academic Honesty Panel involved only an outcome "less than removal from the rolls" and thus involved no "cognizable property interest."[6]  (*See* Doc. 48-1 at 19-22.)  Plaintiff, for his part, characterizes most of the events in question as an extended "disciplinary dismissal."  (*See* Doc. 55 at 23.)

The Court recognizes that, from Plaintiff's point of view, the course of events that begin with his being haled into the "Facilitated Discussion" and ended with his dismissal by his graduate program could only seem like an extended disciplinary process.  Nevertheless, it is inclined to agree with Defendants that there are really two separate decisions at issue, one "disciplinary," and one "academic."  The disciplinary process culminated in the findings of the Academic Honesty Panel and the assignment of the failing grade to Plaintiff's comprehensive exam.  The academic decision, by contrast, consisted of Feldman and Harmon's decision to assign Plaintiff a failing grade on the comprehensive examination course and to dismiss him from the

---

[6] Defendants also argue that in what it considers to be the disciplinary portion of the proceedings, Plaintiff simply received all the process he was due.  (Doc. 48-1 at 19-20.)

program in accordance with the Department's policy regarding students who twice fail the comprehensive exam.  It is alleged that Feldman and Harmon decided very early in the disciplinary process that they wanted Plaintiff to be dismissed, and that they vigorously argued for his guilt in the proceedings. But they were not the relevant decision makers in that process—the allegations indicate that the Academic Honesty Panel made its own findings and an independent decision as to the proper penalty.[7]

As for the aspects that Defendants Harmon and Feldman did control, it is difficult to imagine a more "academic" decision than how to determine the final grade on a doctoral student's comprehensive examination or a pass/fail course.  Whether and how to "extrapolate" the "zero grade"—to the extent that Defendants Harmon and Feldman reasonably had discretion about how to do this—would seem to depend on an instructor's judgment about the structure of an exam, the weight of its different sections, and the criteria for passing the comprehensive exam course.  So, too, the question of whether a student in Plaintiff's position was making "academic progress."  One of the basic rationales behind the Supreme Court's decision in *Horowitz* was that "[a]cademic evaluations of a student, in contrast to disciplinary

---

[7] A majority of the Academic Honesty Panel found it "more likely than not" that the alleged violations occurred.  (Doc. 43 at 29, ¶ 89.)

determinations, bear little resemblance to the judicial and administrative fact-finding proceedings to which we have traditionally attached a full-hearing requirement." *Horowitz*, 435 U.S. at 89. "Like the decision of an individual professor as to the proper grade for a student in his course, the determination whether to dismiss a student for academic reasons requires an expert evaluation of cumulative information and is not readily adapted to the procedural tools of judicial or administrative decisionmaking." *Id.* These reasons have the same force here. The questions of how Plaintiff's disciplinary penalty should be computed into his course grade and how it reflected on his general academic progress are, the Court finds, essentially academic ones.

The Court will therefore apply separate standards of procedural due process review to these distinct portions of the facts. The disciplinary portion comprises the events from the Facilitated Discussion to the findings of the Academic Honesty Panel, as well as Plaintiff's associated appeal. The academic portion comprises the decisions of Defendants Harmon and Feldman regarding Plaintiff's grades and his dismissal, as well as the separate set of appeals of the dismissal decision.

### ii.    Procedural Due Process in the Disciplinary Proceedings

"The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v.*

19

*Eldridge*, 424 U.S. 319, 333, (1976) (citation omitted).  In applying this flexible standard to high school students facing disciplinary suspensions, the Supreme Court in *Goss v. Lopez* held that the Due Process Clause entitled the students to a minimum of "*some* kind of notice and . . . *some* kind of hearing."  419 U.S. 565, 579 (1975) (emphasis in original).  The Eleventh Circuit has further elaborated this standard with respect to university students facing expulsion: "[A]n opportunity to hear both sides in considerable detail is best suited to protect the rights of all involved.  This is not to imply that a full-dress judicial hearing, with the right to cross-examine witnesses, is required."  *Nash v. Auburn Univ.*, 812 F.2d 655, 660 (11th Cir. 1987) (quoting *Dixon v. Ala. State Bd. of Educ.*, 294 F.2d 150 (5th Cir.), *cert. denied*, 368 U.S. 930 (1961)).

The adequacy of the notice and the nature of the hearing required will depend on an "appropriate accommodation of the competing interests involved."  *Goss*, 419 U.S. at 579.  In a case like this one—it involved graduate students facing dismissal as a result of academic dishonesty charges—the Eleventh Circuit held that due process did not require "any more in the way of notice than a statement of the charge against them," at least where such notice was provided about six days before the hearing was to be held.  *See Nash*, 812 F.2d at 663.  As for the hearing itself, "[d]ue process requires that [accused students] have the right to respond, but their rights in the academic

disciplinary process are not co-extensive with the rights of litigants in a civil trial or with those of defendants in a criminal trial," and it is not required that they be allowed to cross-examine adverse witnesses or receive a full adversary proceeding. *Id.* at 663-64 (citing *Goss*, 419 U.S. at 583; *Jenkins v. La. State Bd. of Educ.*, 506 F.2d 992, 1000 (5th Cir.1975)).

For state action to implicate constitutional due process protections, it must deprive a person of an identified liberty or property interest. *See* U.S. Const. amend. XIV.; *Goss*, 419 U.S. at 572-73*; Woodruff v. U.S. Dep't of Labor*, 954 F.2d 634, 641 (11th Cir. 1992) ("Our inquiry into whether there was a denial of due process involves a two-part analysis. We must determine whether [plaintiff] was deprived of a protected property interest, and if so, what process was due."). On the one hand, a student's entitlement to continued enrollment at an institution of higher education, at least where it has been impliedly or explicitly communicated that it cannot be removed without cause, has been recognized in this circuit as "clearly" an "entitlement sufficiently important to warrant protection under the Due Process Clause." *Barnes v. Zaccari*, 669 F.3d 1295, 1305 (11th Cir. 2012). On the other hand, Defendants argue that *Barnes* is inapposite because the penalty assessed in the *disciplinary* proceedings against Defendant was only a failing grade, not

21

dismissal.   Therefore, they argue, Plaintiff can point to "no clear caselaw holding that a property interest exists."[8]

Plaintiff, indeed, has not.  Nevertheless, there is a substantial volume of caselaw in which courts have conducted due process analysis regarding grade determinations while assuming, without deciding, that a protectible property or liberty interest in the grade does exist.  *See, e.g., Lambert v. Bd. of Trustees,* 793 F. App'x 938, 943-44 (11th Cir. 2019) (analyzing whether student assigned a failing grade as a disciplinary penalty received due process, while "express[ing] no opinion as to whether [he] had a cognizable liberty or property interest in his grade"); *see also Hill v. Trustees of Indiana Univ.*, 537 F.2d 248, 252 (7th Cir. 1976) (assuming that the imposition of failing grades as a penalty for plagiarism gives rise to a "property" or "liberty" interest protected by the Fourteenth Amendment); *Dunn v. Fairfield Cmty. High Sch. Dist. No. 225*, 158 F.3d 962, 964 (7th Cir. 1998) (suggesting that a protected due process interest

---

[8] Defendants also point to a footnote in *Barnes* that clarified its holding:

> We do not hold that all students at state colleges and universities are entitled to continued enrollment.  We hold only that one making satisfactory academic progress and obeying the rules of the school has a legitimate claim of entitlement to continued enrollment under the Board and VSU's policies.

669 F.3d at 1305 n.9.  In this case, however, it would be question-begging to allow this language to resolve the issue of whether Plaintiff had a property interest.  Whether he was "obeying the rules of the school" is precisely what his hearing before the Academic Honesty Panel was supposed to determine.

existed with respect to two high school students' failing grades); *Diseasa v. St. Louis Cmty. Coll.*, 79 F.3d 92, 95 (8th Cir. 1996) (assuming that student handbook setting forth a grievance procedure to contest an allegedly capricious or improper grade can establish a property interest in non-arbitrary grading). Given the nature of the grade at issue—not just an ordinary test, but a doctoral student's qualifying examination—and the academic consequences that flowed from the failing grade, the Court finds it appropriate to make the same assumption here.

Assuming the existence of a protected property interest in Plaintiff's grade, the Court finds that Plaintiff has plausibly alleged a procedural due process violation with respect to the lack of notice of the unauthorized assistance charge. Before addressing this issue, however, it is necessary to underscore which aspects of the claims do *not* amount to due process violations. In the first place, much of what is alleged about the disciplinary proceedings is not relevant to the procedural due process inquiry at all. For example, Plaintiff makes much of the fact that the university seems not to have followed its own rules in certain respects, and that Defendants Harmon and Feldman were not as cooperative as he believes they should have been. But "[e]ven if [a] university depart[s] from its own regulations, not every violation by an agency of [its own] rules rises to the level of a due process claim." *Garrett v. Mathews*,

625 F.2d 658, 660 (5th Cir. 1980).  The relevant constitutional question is not whether the Academic Honesty Policy was followed to the letter, but whether the process that Plaintiff actually received comported with the requirements of the Due Process Clause.  *See id.*; *Levitt v. Univ. of Tex. at El Paso*, 759 F.2d 1224, 1229-30 (5th Cir. 1985).

With respect to Plaintiff's right to an "opportunity to be heard," it is irrelevant that Defendants Harmon and Feldman did not believe Plaintiff's side of the story.  In addition, Harmon and Feldman were not the decisionmakers in the disciplinary process—the Academic Honesty Panel was. Finally, the fact that Feldman was "allowed to freely make interjections . . . in attempts to falsify Plaintiff's statements" during the hearing (Doc. 43 at 33, ¶ 104) does not suffice to allege a deprivation of Plaintiff's right to an opportunity to be heard.  The core of the hearing requirement is that the accused must "have the right to respond," *see Nash*, 812 F.2d at 663 (citing *Goss*, 419 U.S. at 583), which Plaintiff clearly had here.  While the allegation that Plaintiff was interrupted by Dr. Feldman suggests that the procedural rights accorded to Plaintiff may have fallen short of "the rights of litigants in a civil trial," *id.*, this does not mean that his constitutional rights were violated.  On the contrary, Plaintiff states on information and belief that the hearing panel accepted some of his explanations and, for that reason, assessed him less than

the maximum penalty for his violation.  (Doc. 43 at 38, ¶ 126.)  This suggests that Plaintiff had an opportunity to be heard and to respond to the charges against him.  It must also be said that Plaintiff received two separate such opportunities—the Facilitated Discussion and the Continued Discussion.  He also was granted an appeal to the designee of the university president, who affirmed the Panel's findings.  And he could have appealed further to the Board of Regents, although he did not do so, feeling it would be "futile and inadequate." (Doc. 55 at 18-19.)  Taken together—and in the absence of other allegations that might suggest unfairness in the hearings themselves—the process as alleged was certainly sufficient to meet "the fundamental requisite of due process of law," namely "the opportunity to be heard." *Goss*, 419 U.S. at 579; *Nash*, 812 F.2d at 663.

But another "elementary and fundamental requirement of due process . . . is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Nash*, 812 F.2d at 661 (quoting *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 13 (1978)).  Plaintiff plausibly alleges that the notice in his disciplinary proceedings fell short of the constitutional minimum.  He alleges that he was only notified of the unauthorized assistance charge against him "*during* his hearing for alleged plagiarism" and that he did

not receive any prior notice of this charge.  (Doc. 55 at 17; Doc. 43 at 33, ¶ 106) (emphasis added).  The document that notified Plaintiff of the "Continued Discussion" (the hearing) refers only to plagiarism.  (Doc. 43-2 at 3.)  If the notice requirement is to have any meaning—indeed, if there is any meaning to the word "notice" itself—raising accusations in the middle of a hearing cannot amount to "informal notice," as Defendants argue it does.  Learning of a charge *during* a hearing is just what happens when one does not receive any notice of that charge.

The *Goss* Court, it is true, noted that "[t]here need be no delay between the time 'notice' is given and the time of the hearing."  419 U.S. at 582.  But *Goss* pertained to high school students facing only a "short suspension, not exceeding 10 days," and the Court explained that "longer suspensions or expulsions . . . may require more formal procedures."  *Id.* at 584.  Here, Plaintiff was facing possible expulsion from a university, not a short suspension from a high school.  (*See* Doc. 43-6 at 13-14 (Academic Honesty policy's list of possible consequences of a violation).)  These factors probably explain why the Eleventh Circuit required more formal notice in the university context of *Nash* than the Supreme Court required in *Goss.*  *See Nash*, 812 F.2d at 663 (finding the notice sufficient where *the specific accusations*, along with a list of accusing

witnesses, were given to plaintiffs one day before the hearing, after a more general notice had been provided five days before).

In any event, "no delay" between notice and hearing is not the same as notice *during* a hearing.  If the latter were permitted to satisfy the notice requirement, there would be no reason to distinguish between notice and hearing at all.  The two requirements would collapse into one another.  It matters, finally, that Plaintiff received clear advance notice of one of the charges but not the other.  One in receipt of a letter stating only that "a Continued Academic Honesty Discussion has been scheduled . . . to determine the outcome of the possible plagiarism in Doctor of Public Health Comprehensive Examination" might reasonably assume that the Discussion pertained only to the plagiarism issue.  (Doc. 43-2 at 3.)  Introducing a second accusation in the middle of this hearing—and later judging a student guilty of it—amounts to a kind of bait-and-switch.  For these reasons, Plaintiff has plausibly alleged that the notice he received did not adequately "inform [him] of the accusations against [him]" in his disciplinary process.  *Nash*, 812 F.2d at 662.

### iii.    Procedural Due Process in the Academic Dismissal

The Due Process Clause does not require formal hearings with respect to academic dismissals.  Instead, the dismissal decision must only be "careful

and deliberate." *See Bd. of Curators, Univ. of Mo. v. Horowitz*, 435 U.S. 78, 85-87 (1978); *accord Haberle v. Univ. of Ala. in Birmingham*, 803 F.2d 1536, 1539 (11th Cir. 1986).  The reason for this more flexible standard pertains to the specialized nature of academic decision-making.  As the Supreme Court put it: "Like the decision of an individual professor as to the proper grade for a student in his course, the determination whether to dismiss a student for academic reasons requires an expert evaluation of cumulative information and is not readily adapted to the procedural tools of judicial or administrative decisionmaking."  *Horowitz*, 435 U.S. at 89.  Although the decision of Defendants Harmon and Feldman was made with alacrity, it followed from a policy stated in the College of Public Health's Student Handbook that "any student who fails the comprehensive examination twice will be dismissed from the DrPH program by the HPAM [the Department of Health Policy and Management]."  (Doc. 43, ¶ 131; *see also* Doc. 43-8.)  Where a clear policy like this already exists, one would expect that less deliberation would be required.  And even if there were a question about the "careful and deliberate" nature of Harmon and Feldman's decision, Plaintiff also received five separate appeals of his dismissal decision, including discretionary review by the Board of Regents.  These additional layers of deliberation affirm that the pleading does not plausibly allege that the dismissal decision fell short of the *Horowitz*

standard. *See Haberle*, 803 F.2d at 1539 (holding that a graduate student dismissed for failing his comprehensive exam received adequate process where, *inter alia*, "he was given two opportunities to take the exam," had discussions with several relevant officials, and had review by an impartial committee).[9]

### iv.   Miscellaneous Due Process Claims

Plaintiff also presses due process claims regarding the failure of his department to appoint him an advisory committee and the failure of Defendant Feldman to enter his failing comprehensive exam grade into his transcript. Plaintiff has not alleged facts to show that either of these are cognizable property interests—that is, "individual entitlement[s] grounded in state law, which cannot be removed except 'for cause.'" *Logan v. Zimmerman Brush Co.*,

---

[9] Plaintiff's filings vigorously contest the way Defendants Harmon and Feldman "extrapolated" the "zero grade" penalty assigned by the Academic Honesty Panel in such a way that the penalty led to his failure of the entire comprehensive examination course. To the extent that these allegations are meant to show procedural carelessness (rather than substantive error, which we could not address, *see supra* Part III(A)), the Court does not think they push Plaintiff's procedural due process allegations into the realm of the "plausible." As discussed above, the matter of how to grade the test and the course is squarely one of academic judgment about the structure of the test and the course. If this is not well within the reasonable professional judgment of an instructor, little is. In any event, it does not seem unreasonable that receiving a zero on half of an examination that constitutes the entire grade for a course could result in failure of that course.

455 U.S. 422, 430 (1982).   Even assuming they were, due process claims regarding these interests would be barred, as Defendants argue, by the availability of an adequate state judicial remedy.   *See McKinney v. Pate*, 20 F.3d 1550, 1564 (11th Cir. 1994) (*en banc*) ("[T]he presence of a satisfactory state remedy mandates that we find that no procedural due process violation occurred."); *Cotton v. Jackson*, 216 F.3d 1328, 1331 (11th Cir. 2000) ("[T]he state must have the opportunity to remedy the procedural failings of its subdivisions and agencies in the appropriate fora—agencies, review boards, and state courts[—]before being subjected to a claim alleging a procedural due process violation.").   The existence of a possible state court action to secure the relief Plaintiff desires—the appointment of the advisory committee or the entry of the final grade—bars him from seeking relief under a constitutional due process theory.   *See Wells v. Columbus Tech. Coll.*, 510 F. App'x 893, 897 (11th Cir. 2013) (finding that, in Georgia, "mandamus is an available state remedy" to cure the absence of a post-deprivation hearing for a suspended college student, and that "[s]o long as the state court has the power to remedy any alleged procedural deficiency, Mr. Wells was not deprived of due process."); *Doe v. Valencia Coll.*, 903 F.3d 1220, 1234-35 (11th Cir. 2018) ("Because Florida provides an adequate [mandamus] remedy, the district court did not err by granting summary judgment in favor of Valencia on Koeppel's procedural due

process claim."); *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1294 (11th Cir. 2007)

(holding that a graduate student dropped from a required course could not

raise a procedural due process claim because "several Florida Administrative

Code sections and state court decisions indicat[ed] that [the student] could seek

relief for his procedural deprivations in state court").  The state remedy need

not be ideal or identical to the remedy under § 1983.  *Cf. Hudson v. Palmer*,

468 U.S. 517, 535 (1984).  Plaintiff has not alleged any facts showing that these

remedies would be inadequate.  He has thus failed to state procedural due

process claims regarding the advisory committee and the entry of the grade.[10]

---

[10] Defendants do not raise the question of state remedies in the context of
Plaintiff's due process claims regarding the disciplinary process or academic
dismissal.  As discussed below (Part V), the Court will dismiss the
disciplinary procedural due process claim on qualified immunity grounds.
However, for precision's sake, the Court notes that the availability of state
remedies would also provide an independent ground for dismissing Plaintiff's
procedural due process claims.  In addition to the cases cited in the preceding
paragraphs, a Georgia statute gives students at public universities in the
state the opportunity to appeal disciplinary decisions to state courts.  *See*
O.C.G.A. § 50-13-19; *Bd. of Regents of Univ. Sys. of Ga. v. Houston*, 282 Ga.
App. 412, 415 (2006) (applying O.C.GA. § 50-13-19 to university's decision to
suspend student); *see also Sasser v. Bd. of Regents of Univ. Sys. of Ga.*, No.
1:20-CV-4022-SDG, 2021 WL 4478743 (N.D. Ga. Sept. 30, 2021), *appeal
dismissed*, No. 21-14433-AA, 2022 WL 854322 (11th Cir. Feb. 15, 2022)
(dismissing procedural due process claim arising out of university
disciplinary action for failure to take advantage of this state remedy).  Here,
the result will be the same as if the Court had considered this point, and the
Court prefers to decide the matter on the arguments explicitly raised by
Defendants.

## IV.    Race and National Origin Discrimination Claims

## A. Legal Standard

In addition to his due process claims, Plaintiff also brings race and national origin discrimination claims under 42 U.S.C. § 1981[11] (against Harmon and Feldman) and Title VI of the Civil Rights Act of 1964, codified as 42 U.S.C. § 2000d[12] (against the Board of Regents).  Defendant is Black, a

---

[11] 42 U.S.C. § 1981 provides as follows:

(a) Statement of equal rights

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b) "Make and enforce contracts" defined

For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

(c) Protection against impairment

The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

[12] 42 U.S.C. § 2000d provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

citizen of Sierra Leone, and a naturalized citizen of the United States.  His complaint alleges that, *inter alia*, the alleged defects in his disciplinary process, his dismissal from the graduate program, the failure of his program to appoint an advisory committee for him, and the failure of Defendants Feldman and Harmon to properly enter his failing grade in the comprehensive examination course were intentional discriminatory treatment motivated by his race or national origin.  (Doc. 55 at 26-28.)  Defendants move to dismiss the discrimination claims on the grounds that Plaintiff has failed to state facts sufficient to sustain them under the operative standards.  (Doc. 48-1 at 24-25.)

"Racial discrimination claims under Title VI, the Equal Protection Clause, and § 1981 are analyzed under the same framework." *Farmer v. Bd. of Regents of Univ. Sys. of Ga.*, 589 F. App'x 913, 915 (11th Cir. 2014) (citing *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1325 n.14 (11th Cir. 2011); *Elston v. Talladega Cnty. Bd. of Educ.*, 997 F.2d 1394, 1406 n.11 (11th Cir. 1993)).  "To establish a violation of either Title VI or § 1981, a plaintiff must show that a challenged action was the result of intentional discrimination on the part of the defendant."  *Sirpal v. Univ. of Miami*, 509 F. App'x 924, 926 (11th Cir. 2013) (citing *Howard v. BP Oil Co., Inc.,* 32 F.3d 520, 524 n.2 (11th Cir. 1994); *Elston v. Talladega Cnty. Bd. of Educ.*, 997 F.2d 1394, 1405-06 & n.11 (11th Cir. 1993)).  To state a claim at the pleading stage, therefore, a

plaintiff must "allege facts supporting a reasonable inference of intentional discrimination." *Ford v. Strange*, 580 F. App'x 701, 713 (11th Cir. 2014) (citing *Gen. Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 391 (1982)); *accord Andrews v. City of Hartford*, 700 F. App'x 924, 926 (11th Cir. 2017) (requiring plaintiff in Title VII case to allege "sufficient facts to allow the court to draw the reasonable inference that the employer engaged in discrimination"); *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1269-70 (11th Cir. 2004); *Henley v. Turner Broad. Sys., Inc.*, 267 F. Supp. 3d 1341, 1352 (N.D. Ga. 2017).

Allegations that might give rise to an inference of intentional discrimination can take the form of direct or circumstantial evidence of discrimination.  One common form of circumstantial evidence involves the identification of comparator individuals who differ in the pertinent characteristics (here, race or national origin) but are "similarly situated" in most other relevant ways and who were treated more favorably than the plaintiff.  Here, Plaintiff's factual allegations pertaining to race discrimination depend primarily on circumstantial evidence of this type.[13]

---

[13] The absence of direct evidence—"evidence that establishes the existence of discriminatory intent behind the employment decision without any inference or presumption," *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998)—is of course not prejudicial in itself.  Such evidence is relatively rare in discrimination cases, and alleging circumstantial evidence is the most common route.  *See U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711,

Although the forms of circumstantial evidence often used to state a claim for intentional discrimination under Title VI and § 1981 derive from the burden-shifting framework first set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), a plaintiff is not required to state a full *McDonnell Douglas* prima facie case to survive a motion to dismiss.[14]  For the same reason, the idea that the same rigid requirements for comparators apply at the pleading stage as apply after discovery is misguided.  Comparators are not necessarily required at all.  The Supreme Court squarely held in *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 511 (2002) that the prima facie case "is an evidentiary standard, not a pleading requirement," designed to allocate the burden of proof at summary judgment or trial rather than to establish a pleading standard for intentional discrimination claims.  To be sure, *Swierkiewicz* was decided under the more liberal pleading standards of the era

---

716 (1983) ("There will seldom be 'eyewitness' testimony as to the employer's mental processes."); *Calhoun v. McHugh*, 2 F. Supp. 3d 1217, 1232 (N.D. Ala. 2014) ("Direct evidence of discriminatory intent is rare.").

[14] "Although the *McDonnell Douglas* prima facie model was initially developed in the context of a discriminatory hiring claim, the purpose underlying that method of analysis . . . retains equal validity where discriminatory discipline is alleged." *Jones v. Gerwens*, 874 F.2d 1534, 1539 (11th Cir. 1989); *see Burke-Fowler v. Orange County*, 447 F.3d 1319 (11th Cir. 2006).  The standard applies to academic as well as professional discipline.  *See Stanislaus v. Emory University*, 255 F. App'x 459, 460 (11th Cir. 2007).

before *Twombly* and *Iqbal*.  But there is no reason to think that either *Twombly* or *Iqbal* overturned the holding of *Swierkiewicz* just quoted—namely that the prima facie case is not a pleading standard.  On the contrary, the Eleventh Circuit has affirmed that it did not.  *Surtain v. Hamlin Terrace Found.*, 789 F.3d 1239, 1246 (11th Cir. 2015).

Indeed, one need only look to *Iqbal* itself for an example of a court's task in evaluating an intentional discrimination claim under Rule 12(b)(6).  In *Iqbal*, the central claim was "invidious discrimination in contravention of the First and Fifth Amendments," which required the plaintiff "to plead and prove that the defendant acted with discriminatory purpose."[15]  *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).  The Court made not a single reference to comparators, prima facie cases, or any of their ilk.  *See generally id.*  The question was simply whether "the complaint's well-pleaded facts g[a]ve rise to a plausible inference" that the challenged policy was purposefully adopted as a result of intentional discrimination.  *Id.* at 682.

---

[15] The precise causes of action plead in *Iqbal* were not the same as those plead here, but all require intentional discrimination.  Recall that "[r]acial discrimination claims under Title VI, the Equal Protection Clause, and § 1981 are analyzed under the same framework."  *Farmer v. Bd. of Regents of Univ. Sys. of Ga.*, 589 F. App'x 913, 915 (11th Cir. 2014) (citing *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1325 n.14 (11th Cir. 2011); *Elston v. Talladega Cnty. Bd. of Educ.*, 997 F.2d 1394, 1406 n.11 (11th Cir. 1993)).

This is the clear rule in the Eleventh Circuit as well. *Surtain*, 789 F.3d at 1246 (11th Cir. 2015) ("The District Court did not use the *Iqbal/Twombly* plausibility standard to determine whether to enter default judgment on Surtain's race-discrimination claims.   Instead, the District Court held that Surtain 'fail[ed] to plead a valid claim for relief,' because she had not made out a prima facie case of racial discrimination under *McDonnell Douglas*.   In applying the wrong legal standard, the District Court abused its discretion."); *Powers v. Sec'y, U.S. Homeland Sec.*, 846 F. App'x 754 (11th Cir. 2021) (holding that a district court erred where it "evaluat[ed] [the plaintiff's] race discrimination claim under the *McDonnell Douglas* framework at the pleading stage" and dismissed it for failing to identify a comparator, which was not required).   The Court finds it necessary to draw out this standard in part because Defendants' arguments about Plaintiff's race discrimination claims are directed at the weakness of his alleged comparators.[16]

The standard to be applied at the motion to dismiss stage for claims involving intentional discrimination is simple.   The claims will survive 12(b)(6)

---

[16] There are cases where § 1981, Title VI, or Title VII race discrimination claims were dismissed at the pleading stage because they failed to allege all the facts that would be necessary to establish a viable comparator after discovery under the *McDonnell Douglas* framework.   But such an approach is inconsistent with Eleventh Circuit and Supreme Court precedent.

motions "when the well-pleaded factual allegations of a complaint plausibly suggest that the plaintiff suffered an adverse . . . action due to intentional racial discrimination." *Surtain*, 789 F.3d 1239, 1246 (11th Cir. 2015).  Of course, it is not enough merely to state in a conclusory way that some decision was taken for discriminatory reasons.   Only the "well-pleaded factual allegations" are relevant, and some of these must at least amount to circumstantial evidence of discriminatory intent.  *Id.*; *see also Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1270-71 (11th Cir. 2004) ("[W]hile *Swierkiewicz* made clear that pleading a *McDonnell Douglas* prima facie case was not necessary to survive a motion to dismiss, it did not even remotely suggest that a pleading could survive dismissal when it consisted of only the barest of conclusory allegations without notice of the factual grounds on which they purport to be based.")  As noted above, the role comparators play in a pleading is as a form of circumstantial evidence.  At the motion to dismiss stage, the Court must consider a plaintiff's allegations regarding comparators not according to any rigid standards, but simply according to what plausible inferences reason, aided by "experience and common sense," *Iqbal*, 556 U.S. at 679, permits the Court to draw.  Thus, any comparators alleged at this stage need not necessarily "be similarly situated in all relevant respects" with the

Plaintiff, *Jackson*, 372 F.3d at 1273-74, although obviously the more similar they are, the stronger the inferences they will support.

The Court will now turn to the specific claims pressed by Plaintiff. Because the allegations of race and national origin discrimination are brought under separate Counts against separate defendants—the Board of Regents under Title VI and Harmon and Feldman under § 1981—the Court will address each in turn.

### B. Title VI Claims Against the Board of Regents

Despite the length of the Second Amended Complaint, the factual allegations pertaining to the discrimination claims against the Board of Regents are exceedingly thin. Conclusory allegations such as the statement that "[o]n information and belief, Plaintiff's dismissal was motivated by discrimination based on Plaintiff's race," are not "entitled to the assumption of truth" at the motion to dismiss stage. *Iqbal*, 556 U.S. at 664. Thus, with respect to the Board of Regents, the only well-pled factual allegations are those pertaining to the six other doctoral students, whom Plaintiff alleges are all white, who were formally accused of plagiarism violations in the spring of 2019. (Doc. 43 at 126-27, ¶¶ 452-458.) Plaintiff alleges that these students were not subject to the same intransigence and prejudgment of guilt on the part of the "reporting instructor" (here, Defendant Harmon) in their proceedings, and that

39

none of these students was subject to the additional, post-hearing consequences imposed at the department level.

The main problem is that this allegation cannot give rise to any inference about the *Board of Regents* having the intent to impermissibly discriminate in some way. There is no suggestion that the Board, for example, promulgated an Academic Honesty Policy intended to impose harsher penalties or afford fewer procedural safeguards to Black or Sierra Leonian students. There is no indication that the Board had anything at all to do with the way Plaintiff's own "Facilitated Discussion" and "Continued Discussion" were conducted. And, as far as the Board's direct involvement with Plaintiff is concerned, the allegations provide no basis for the inference that its affirmance of his appeal was discriminatory.[17] For these reasons, the Title VI claim is due to be dismissed.

## C. § 1981 Claim Against Harmon and Feldman

### i.     The Sufficiency of the Allegations

There is a little more substance to the allegations concerning Harmon and Feldman. Some of the allegations, to be sure, provide no support for an

---

[17] Recall too that the Academic Honesty Panel did not terminate Plaintiff from his program. Rather, it determined that Plaintiff would receive a "zero grade" on the assignment containing the plagiarism.

inference of intentional discrimination.  Consider the group of comparators just discussed—the white doctoral students who were also subject to academic honesty proceedings in the spring of 2019.  This allegation just does not permit the Court to infer anything about the intentions of Harmon or Feldman.  It is not alleged that any of these doctoral students were in the same doctoral program as Plaintiff.   For this reason, the   aforementioned group of comparators cannot give rise to any reasonable inferences about the motivations of Harmon and Feldman, who were not alleged to have been involved in the proceedings against any of these other students.  *Cf. Jones v. Gerwens*, 874 F.2d 1534, 1541 (11th Cir. 1989) (stating that "[c]ourts have held that disciplinary measures undertaken by different supervisors may not be comparable for purposes of Title VII analysis," and collecting cases in support).[18]

More useful are the allegations that concern Plaintiff's treatment by Harmon and Feldman before the initiation of his academic honesty proceedings.   The two most relevant to the race and national origin discrimination claims are (1) that Defendant Feldman is white, and (2) that of

---

[18] There is also no allegation that the Academic Honestly Panel itself acted in a discriminatory manner.  It seems, rather, to be part of Plaintiff's claims that the Panel's leniency in imposing a less-than-minimum penalty was improperly overruled by Harmon and Feldman.

the three students in Plaintiff's doctoral cohort, Plaintiff and another Black student were not appointed an advisory committee, while their one white peer was given one.  (Doc. 43 at 114-15, ¶¶ 408-412.)  (The Complaint does not state who did or did not appoint the committee, but Plaintiff's Response states that it was Harmon and Feldman's responsibility to do so.)  (Doc. 55 at 25.)  One might also add the allegations that (3) the feedback on Plaintiff's first comprehensive exam was focused on his spelling and grammar, but he was never assigned any remedial options, and (4) that Feldman and Harmon had apparently come to a predetermined dismissal decision even before the "Facilitated Discussion" as additional facts of potential relevance to the claimed race and/or national origin discrimination.

The Court considers that, accepting all allegations as true and construing the facts in the light most favorable to Plaintiff, these well-pled allegations are sufficient to state a plausible claim against Harmon and Feldman under § 1981.  It is particularly the allegation about the failure of Harmon and Feldman to appoint advisory committees to the Black students in Plaintiff's cohort that creates a basis for a plausible inference of intentional discrimination against Plaintiff.  This allegation, viewed together with the more general allegations regarding the allegedly predetermined dismissal

decision and the alacrity with which Defendant Feldman pursued Plaintiff's

dismissal from the program, are sufficient to survive a motion to dismiss.

To be sure, the handful of well-pled allegations here are sufficient, but

barely so.  Plaintiff will have to make a much stronger factual showing at

summary judgment or trial to succeed on his § 1981 claim.  And the Court of

course does not decide here that Feldman or Harmon acted improperly.

Additional facts may later persuade the Court of any number of alternative

explanations for the facts discussed above.  But all that is required at this stage

is that Plaintiff plead facts that create the plausible inference that he was

intentionally deprived of some of the "benefits, privileges, terms, and

conditions" owed to him by the university on the basis of his race.[19]  28 U.S.C.

§ 1981(b).  He has done so here, if only narrowly.

---

[19] Defendants have not challenged the existence of a contractual relationship
between Plaintiff and the university, so the Court does not address that
question in detail here.  The Court considers that the allegations are sufficient
to state a plausible claim under that component of the statute as well.  The
Supreme Court has held that "contracts for educational services" in the public
university context fall within the meaning of § 1981:

> [W]ith respect to § 1981, we have explained that the provision was
> "meant, by its broad terms, to proscribe discrimination in the
> making or enforcement of contracts against, or in favor of, any
> race." *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 295–
> 296 (1976).  Furthermore, we have explained that a contract for
> educational services is a "contract" for purposes of § 1981. *See
> Runyon v. McCrary*, 427 U.S. 160, 172 (1976). Finally, purposeful
> discrimination that violates the Equal Protection Clause of the

ii.     The Statute of Limitations for § 1981 Actions

Defendants also argue that any § 1981 action pertaining to Plaintiff's advisory committee would be time-barred.  The relevant department policy states that each doctoral candidate in Plaintiff's program would be appointed an advisory committee "[b]efore the end of the first year of residence of a prospective candidate" (Doc. 43-3 at 1), and thus Plaintiff should have become aware of the failure of Feldman and Harmon to appoint his advisory committee by the fall of 2016, a year after his enrollment there.

A two-year statute of limitations applies to some claims brought under § 1981, while a four-year limitation applies to others.  The difference derives from an amendment to § 1981 in 1991 that expanded the statute's definition of "make and enforce contracts" to cover post-formation contractual performance.  *See Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382-83 (2004).  28 U.S.C. § 1658(a) provides for a four-year statute of limitations for civil actions arising under federal statutes enacted after December 1, 1990, and this four-year limitation has been construed to apply to actions enabled by the amendment to § 1981.  *See id.*  Actions arising under the pre-1991

---

Fourteenth Amendment will also violate § 1981.  *See General Building Contractors Assn., Inc. v. Pennsylvania*, 458 U.S. 375, 389-390 (1982).
*Gratz v. Bollinger*, 539 U.S. 244, 276 n.23 (2003).

version of the statute are, meanwhile, still governed by the relevant state statutes of limitations for personal injuries, which in Georgia is two years. *See Grimes v. Bd. of Regents of Univ. Sys. of Ga.*, 650 F. App'x 647, 651 (11th Cir. 2016); *Williams v. City of Atlanta*, 794 F.2d 624, 626 (11th Cir. 1986); O.C.G.A § 9-3-33.

Any claim pertaining solely to the advisory committee would fall under the post-1991 portion of § 1981, relating as it does to Plaintiff's access to the "benefits, privileges, terms and conditions" owed to him. Thus, the four-year limitations period would apply. Plaintiff filed the present lawsuit in December 2020, so it follows that a stand-alone advisory committee claim that accrued at the beginning of Plaintiff's second year would be time-barred by a matter of months. The Court, however, will not dismiss the cause of action under this limitations period at this stage. Plaintiff's § 1981 claim applies to more than just any alleged dereliction regarding the advisory committee. It alleges discriminatory treatment regarding Plaintiff's dismissal and certain other benefits he argues he was entitled to as a graduate student in the Department of Health Policy and Management, injuries which allegedly occurred within four, and in some cases two, years of the initiation of this suit. It further alleges that the failure to appoint an advisory committee was a continuous violation that endured after his first

year, despite his repeated requests for the committee. Of course, depending on how the facts develop, these statute of limitations issues may become relevant later.

## V.    Qualified Immunity

Plaintiff's only viable claims are his procedural due process claim relating to notice of his disciplinary proceedings and his § 1981 claim against Professors Harmon and Feldman. Defendants argue that all named individual capacity defendants are entitled to qualified immunity, and the Court now considers this argument.

"While the defense of qualified immunity is typically addressed at the summary judgment stage of a case, it may be . . . raised and considered on a motion to dismiss." *St. George v. Pinellas Cnty.*, 285 F.3d 1334, 1337 (11th Cir. 2002) (citing *Chesser v. Sparks*, 248 F.3d 1117, 1121 (11th Cir. 2001)). "To claim qualified immunity, a defendant must first show he was performing a discretionary function." *Barnes v. Zaccari*, 669 F.3d 1295, 1303 (11th Cir. 2012). Plaintiff does not dispute that the defendants were performing discretionary functions when they committed their allegedly rights-violating conduct (*see* Doc. 55 at 30), so the question here is whether "the complaint fails to allege the violation of a clearly established constitutional right." *St. George*, 285 F.3d at 1337 (quoting *Chesser*, 248 F.3d at 1121). The Court has already

considered whether Plaintiff has stated a claim for the violation of his rights, and it found that he had done so with respect to only two claims: his procedural due process rights in his disciplinary hearing, specifically with respect to the adequacy of notice, and the § 1981 race discrimination claim against Defendants Harmon and Feldman.  At this stage, the Court must therefore ask whether the alleged violations were violations of "clearly established constitutional right[s]."  *Id.*

The law setting forth a "clearly established" right must be "sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)) (cleaned up).  The Supreme Court does "not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."  *Id.* (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011)).  Courts are admonished "not to define clearly established law at a high level of generality," but rather to ask "whether the violative nature of particular conduct is clearly established."  *al-Kidd*, 563 U.S. at 742.  The "usual way" of answering this question is "pointing to a case, in existence at the time, in which the Supreme Court or [the Eleventh Circuit] found a violation based on materially similar

facts." *Johnson v. City of Miami Beach*, 18 F.4th 1267, 1273 (11th Cir. 2021). The Court will address the procedural due process and § 1981 rights in turn.

## A. Procedural Due Process

As discussed above, the inquiry into whether there was a denial of due process "involves a two-part analysis": the Court must determine "whether [Plaintiff] was deprived of a protected property interest, and if so, what process was due." *Barnes*, 669 F.3d at 1303 (citing *Woodruff v. U.S. Dep't of Labor*, 954 F.2d 634, 641 (11th Cir. 1992)).  Both the existence of the property right and the nature of the process due must be "clearly established" to overcome the qualified immunity defense.  *See id.* at 1303-07 (analyzing whether both the existence of a protectible property interest and the process due to the plaintiff were clearly established).  Here, Plaintiff cannot show that he has a clearly established protectible property interest in his comprehensive exam grade.[20]

---

[20] The Academic Honesty Panel, which failed to provide Plaintiff with adequate notice, only assigned Plaintiff the consequence of a zero grade on the academic work in question.  It allegedly decided not to assign any further penalties, including dismissal.  That is why the Court considers whether Plaintiff has a property interest in his exam grade rather than in his continued enrollment in the program.  Compare these facts with those in *Barnes*, where it was the university administration that directly disciplined and expelled the plaintiff without due process.  669 F.3d at 1300-01.  In *Nash*, it was a university body equivalent to the Academic Honesty Panel that recommended a removal from the rolls as punishment.  *Nash v. Auburn Univ.*, 812 F.2d 655, 658 (11th Cir. 1986).

It must be said at the outset that Plaintiff's brief cites only one case—and only to state the general legal standard—in its section addressing Defendants' entitlement to qualified immunity. (*See* Doc. 55 at 30-31.)  "Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate."  *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002).  Plaintiff's brief as a whole cites no cases establishing the existence of a protectible property right in a grade on a comprehensive exam.

It is, to be sure, clearly established that "when a government benefit cannot be removed except 'for cause,' an individual has a property interest in that benefit[.]"  *Barnes*, 669 F.3d at 1307 (cleaned up) (citing *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 430 (1982).  The question then becomes whether it is clearly established that such an interest "rises to the level of a legitimate claim of entitlement protected by the Due Process Clause," or in other words is "sufficiently important to warrant protection under the Due Process Clause."  *See id.* at 1303, 1305.  It is this latter question that creates problems for Plaintiff.  *Barnes* held that "no tenet of constitutional law is more clearly established than the rule that a property interest in continued enrollment in a state school is an important entitlement protected by the Due Process Clause of the Fourteenth Amendment."  *Id.* at 1305.  But the Court

has been shown no cases holding that the same is true for penalties short of expulsion, such as the assessment of a failing grade—even a failing grade on a very important exam.

In fact, the cases have been notably circumspect on this point. As discussed above, they have always assumed and never decided the existence of such a right.[21] "In some circumstances, as when an earlier case expressly leaves open whether a general rule applies to the particular conduct at issue, a very high degree of factual particularity may be necessary" to establish that a given rule is "clearly established" by a prior case. *Hope v. Pelzer*, 536 U.S. 730, 740-41 (2002) (quoting *United States v. Lanier*, 520 U.S. 259, 270-71 (1997)). The Court considers that these are such circumstances, where prior cases dealing with disciplinary penalties short of expulsion have not only not

---

[21] *See, e.g., Lambert v. Bd. of Trustees,* 793 F. App'x 938, 943-44 (11th Cir. 2019) (analyzing whether student assigned a failing grade as a disciplinary penalty received due process, while "express[ing] no opinion as to whether [he] had a cognizable liberty or property interest in his grade"); *see also Hill v. Trustees of Indiana Univ.*, 537 F.2d 248, 252 (7th Cir. 1976) (assuming that the imposition of failing grades as a penalty for plagiarism gives rise to a "property" or "liberty" interest protected by the Fourteenth Amendment; *Dunn v. Fairfield Cmty. High Sch. Dist. No. 225*, 158 F.3d 962, 964 (7th Cir. 1998) (suggesting that a protected due process interest existed relative to giving two high school students failing grades in band class); *Diseasa v. St. Louis Cmty. Coll.*, 79 F.3d 92, 95 (8th Cir. 1996) (assuming that student handbook setting forth a grievance procedure to contest an allegedly capricious or improper grade can establish a property interest in non-arbitrary grading).

decided, but have pointedly avoided deciding, whether they implicate a protectible property right.  Under such circumstances, the Court cannot say that Plaintiff had a protectible property interest in his grade that was clearly established at the time of the alleged violations.  Defendants are entitled to qualified immunity regarding the procedural due process claim.[22]

---

[22] Even if Plaintiff did have such property interest, he has also failed to show any clearly established law that would put the particular defendants named in the procedural due process claim on notice that any of *their own conduct* was contrary to the law.  The Second Amended Complaint does not contain any well-pled factual allegations linking any actions of the defendants named in Count III—Dr. Michelle Cook, Mark Wilson, Dr. Ron Wolcott, Mark A. Farmer, Jere W. Morehead, Edward M. Tate, Dr. Tristan Denley, Teresa MacCartney, Dr. Juanita Hicks, or Dr. Joyce A. Jones—to the allegedly insufficient notice regarding the unauthorized assistance charge.  The Court has been shown no law clearly establishing that a university administrator can be held liable for constitutional due process violations only because she "approved of" certain allegedly unconstitutional actions, as the Complaint repeatedly says.  (*See, e.g.,* Doc. 43 at 81-90, ¶¶ 291-317.)  Nor has the Court been shown any law clearly establishing that the denial of an administrative appeal pertaining to an alleged violation is grounds for personal liability on the part of the denying official.  (*See, e.g.*, *id.* at 90, ¶ 318.)  Without more specific factual allegations regarding these administrator defendants, the claims against the university administrators amount to claims for supervisory liability, which is generally not a viable theory under § 1983.  *See, e.g, Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) (holding that supervisory liability under § 1983 occurs only when "the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation").  This problem, although not squarely addressed by the parties, provides an independent ground for the grant of qualified immunity.

**B. Intentional Discrimination Under § 1981**

It is "beyond doubt that . . . the equal protection right to be free from intentional racial discrimination . . . was clearly established" at the time of the alleged discrimination. *Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1478 (11th Cir. 1991); *see also, e.g.*, *Washington v. Davis*, 426 U.S. 229, 239 (1976) ("The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race."); *Brown v. Bd. of Educ.*, 349 U.S. 294, 298 (1955) (Brown II) ("[R]acial discrimination in public education is unconstitutional.")  The allegations here are that Feldman and Harmon's dismissal of Plaintiff, and their denial of certain other benefits he argues he was entitled to as an DrPH graduate student, were the result of intentional racial discrimination against Plaintiff. Even in the absence of Supreme Court or Eleventh Circuit case law addressing a materially similar factual scenario, this is a situation in which the "broad statements of principle in case law are not tied to particularized facts and can clearly establish law applicable in the future to different sets of detailed facts." *Vinyard v. Wilson*, 311 F.3d 1340, 1351 (11th Cir. 2002).  Many cases, for example, squarely address the impermissibility of discriminatory dismissals in the context of public employment.  *See, e.g.*, *Brown v. City of Fort Lauderdale*, 923 F.2d at 1478.  Others squarely address the impermissibility of intentional

52

discrimination in institutions of higher education, including with respect to discipline and other adverse actions against students. *See, e.g., Gratz v. Bollinger*, 539 U.S. 244 (2003) (finding race-based admissions policy in violation of, *inter alia*, § 1981); *Carr v. Bd. of Regents of Univ. Sys. of Georgia*, 249 F. App'x 146, 149 (11th Cir. 2007) (considering racially discriminatory discipline claim in public university).

The "'salient question' . . . is whether the state of the law gave the defendants 'fair warning' that their alleged conduct was unconstitutional." *Id.* at 1312 (quoting *Vaugh v. Cox*, 343 F.3d 1323, 1332 (11th Cir. 2003); *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). In this case, the law undoubtedly would have. A reasonable public university professor or administrator would not need to be "creative or imaginative," *Corbitt v. Vickers*, 929 F.3d 1304, 1311 (11th Cir. 2019), to reason that it was constitutionally impermissible to impose harsher discipline, or to provide less educational support, to a student on the basis of his race.

The Court notes that the question it answers here is distinct from the question of how clearly the allegations suggest that a violation occurred. At this stage, before any discovery has taken place, the Court is bound to take the allegations in the pleading as true and make reasonable inferences in Plaintiff's favor. Having found above that Plaintiff has stated a claim, albeit

narrowly, for intentional race discrimination, it is now obliged to ask not whether Plaintiff has "clearly established" a violation—that is not the standard on a motion to dismiss—but whether the *right* allegedly violated is "clearly established."  The right to be free from intentional race discrimination in a public educational institution undoubtedly is.  At this stage, the Court finds that Defendants Harmon and Feldman are not entitled to qualified immunity.

## VI.   Injunctive Relief and *Ex Parte Young*

Plaintiff has not alleged facts that would establish an entitlement to any injunctive relief.  First, in his Response, Plaintiff "abandons his requested relief pursuant to § 1983 asking for injunctions against Defendants in their individual capacities."  (Doc. 55 at 31-32.)  Second, Plaintiff cannot secure injunctive relief against any Defendants in their official capacities under *Ex Parte Young*, 209 U.S. 123 (1923).  The *Young* doctrine "provides an exception to Eleventh Amendment immunity for lawsuits against state officials as long as the plaintiffs seek only prospective injunctive relief to stop ongoing violations of federal law."  *Friends of Everglades v. S. Fla. Water Mgmt. Dist.*, 570 F.3d 1210, 1215 (11th Cir. 2009) (citing *Fla. Ass'n of Rehab. Facilities, Inc. v. Fla. Dept. of Health & Rehab. Servs.*, 225 F.3d 1208, 1219 (11th Cir.2000)).  Defendants argue that *Ex Parte Young* cannot apply here because any relief that Plaintiff seeks is "relief for alleged past violations."  (Doc. 48-1 at 30.)

Plaintiff argues that, on the contrary, he "will be forever prejudiced by inquiries that call for the disclosure that he was found in violation of unauthorized assistance and plagiarism." (Doc. 55 at 31.)

This may well be true. But it does not follow that "this represents an ongoing constitutional violation and can be remedied with prospective injunctive relief." (*Id.*) Plaintiff describes ongoing reputational harms from his discipline and dismissal by the Defendants, but Courts considering similar cases have not recognized ongoing *harms* as equivalent to ongoing *constitutional violations* for the purposes of *Ex Parte Young. See McLaughlin v. Fla. Int'l Univ. Bd. of Trustees*, 533 F. Supp. 3d 1149, 1170 (S.D. Fla. 2021), *aff'd*, No. 21-11453, 2022 WL 1203080 (11th Cir. Apr. 22, 2022) (rejecting a plaintiff's "ongoing harm theory" of *Ex Parte Young*'s application); *Nicholl v. Att'y Gen. Ga.*, 769 F. App'x 813, 816 (11th Cir. 2019) (same, in case involving ongoing harm from an allegedly erroneous grade). Plaintiff has, thus, not alleged facts that would support an entitlement to injunctive relief against any of the official capacity defendants under *Ex Parte Young*.

## VII.   Punitive Damages and the Length of the Pleadings

A few final points must be addressed. First, Count VII of the Second Amended Complaint advances a claim for "punitive damages," which the Defendants argue must be dismissed because "punitive damages are a type of

damages, not a separate cause of action." (Doc. 48-1 at 31.) They are correct, as Plaintiff essentially concedes in his Response. (Doc. 55 at 33.) Punitive damages are a remedy rather than independent cause of action. *See Cohen v. Office Depot, Inc.*, 184 F.3d 1292, 1297-98 (11th Cir. 1999), *vacated on other grounds*, 204 F.3d 1069 (11th Cir. 2000). The Court will therefore dismiss Count VII but notes, as Defendants do, that at the appropriate stage and "upon proper proof, Plaintiff may recover [punitive damages] if he establishes liability and additionally proves a basis for punitive damages." (Doc. 48-1 at 31-32.)

Finally, Defendants have also argued that the Second Amended Complaint fails to address the serious deficiencies that the Court identified in its December 27 Order (Doc. 39). The Court notes that the pleading retains much repetition and certainly remains vastly longer than necessary. However, because "the law favors rulings on the merits rather than on the pleadings," *Bank v. Pitt*, 928 F.2d 1108, 1112 n.6 (11th Cir. 1991), *overruled on other grounds, Wagner v. Daewoo Heavy Indus. Am. Corp.*, 314 F.3d 541 (11th Cir. 2002), and because the Court has dismissed all but one of Plaintiff's claims under Rule 12(b)(6), it will exercise its discretion not to dismiss the Second Amended Complaint for failing to comply with its previous Order (Doc. 39). It does so, however, with caution to Plaintiff that discovery will be cabined to

material of relevance to the § 1981 claim against Defendants Harmon and Feldman.

**VIII. Conclusion**

For the foregoing reasons, Defendants' Motion to Dismiss (Doc. 48) is **GRANTED IN PART AND DENIED IN PART**.  The motion is granted with respect to Counts I through V and VII of the Second Amended Complaint, which are **DISMISSED WITH PREJUDICE**.  The motion is denied with respect to Count VI of the Second Amended Complaint.  The Clerk is **DIRECTED** to **DISMISS** all defendants except for Defendants Harmon and Feldman in their individual capacities.

**SO ORDERED** this 3rd day of October, 2022.

SARAH E. GERAGHTY
United States District Judge